WEBB and others *v.* ARMISTEAD and others.

*(Circuit Court, E. D. Virginia.* October, 1885.)

1. ASSIGNMENT FOR BENEFIT OF CREDITORS—CAPITAL OF MERCHANT.

The capital of a merchant is that fund which is put up and subjected to the risks of his business as a basis of credit, and as a security to his mercantile creditors against loss from the accidents and misfortunes of trade.

2. SAME—PREFERRING RELATIONS.

If, in any case, this capital is all borrowed, and yet the merchant holds himself out, and allows mercantile agencies to publish him, as owning it in his own right, then a deed made after his failure in business to prefer relations who lent him this capital over the claims of his mercantile creditors is invalid for such a purpose.

3. SAME—BORROWED CAPITAL—ASSIGNMENT TO PROTECT LENDERS.

A merchant, on going into business, borrows large sums from various near relations, and puts the money so raised into the business as capital. The money so borrowed is soon used up in buying out a retiring partner and personal and business expenses. Notwithstanding this, he rates himself in the mercantile agencies as having a capital of $20,000. He afterwards fails, and makes an assignment to a trustee who was his confidential clerk, cognizant of the true state of his affairs, preferring his relatives from whom he had borrowed money. *Held,* that the assignment was void as tending to hinder and delay creditors.

4. SAME—ASSIGNMENT VOID.

A deed empowering the trustee to continue the business for such time as he should think best, and in doing so to make such purchases as might be necessary to enable him to continue and carry on the business with a view to winding it up, and conferring on the creditors no power to check or control the trustee and to wind up and terminate the business, *held,* in this particular case, to be void on its face, as tending to hinder and delay creditors.[1]

In Equity.

*Jackson Guy, Coke & Pickrell,* and *R. G. Pegram,* for trustee and preferred creditors.

*E. Y. Cannon* and *Joseph Christian,* for general creditors.

HUGHES, J. In January, 1882, W. S. Armistead and W. D. Courtney formed a partnership for conducting a mercantile business in oils, greases, and like articles, in the city of Richmond. W. S. Armistead borrowed of his brother Robert the sum of $2,500, giving for it his note, which, with the interest accrued, is preferred in the deed which the bill in this suit attacks. He put $2,000 of the money so obtained into the concern. Courtney put in $1,000. They went on as the firm of Armistead & Courtney for two years. In January, 1884, Courtney drew out, receiving from Armistead $1,700 in cash for his interest, and Courtney became the agent and manager of the new business for Armistead. The evidence does not show whether or not the

---

[1] See note at end of case.

business of the firm had been profitable. It is not shown that any formal inventories were taken, or balance-sheets struck. We know nothing of the condition of the business, except that Courtney drew out of it, taking away the $1,000 which he had put in two years before, and $700 besides. The new business proceeded in the name of W. S. Armistead, who borrowed more money. Through indorsements of a brother-in-law, Charles H. Talbott, and of the house of Talbott & Sons, Armistead raised $10,000 in January, and $2,000 in February, 1884. The latter debt was afterwards reduced to $700. These two debts are preferred in the deed which the court is asked to set aside. Out of the money so obtained Armistead paid, as before said, the amount of $1,700, which Courtney received in retiring as a partner. The business of W. S. Armistead went on from January to July, 1884. His personal expenses in the six months were $2,427; the expenses of running his business were $4,006. These two outlays, with the $1,700 paid to Courtney, nearly consumed the $10,000 borrowed at the commencement of the year. In June, 1884, Armistead borrowed another sum of $300 from his brother Robert, and one of $500 from A. W. Garber, giving his due-bills, which are preferred in his deed of assignment. His sales for the six months on which all these expenses were based were only $34,288; and it seems to be conceded that he sold, frequently and largely, at a loss. His liabilities in July, 1884, were $25,000.40. The skillful management of his stock of goods by Courtney, as trustee and as receiver of this court, has produced an aggregate of only $8,310 as assets; so that, at the end of his career, Armistead was behind in the sum of $16,689.

It thus appears that Armistead had no capital at any time. It is certain that he put none into his business; if we mean by capital that fund which is put up and subjected to the risks of business as a basis of credit, and as a security to mercantile creditors against loss from the misfortunes of trade. Yet it is proved that the firm of Armistead & Courtney allowed themselves to be registered in the mercantile agencies as having $10,000 of capital; and that W. S. Armistead, when he undertook the business alone, in January, 1884, allowed himself to be rated by these agencies as operating upon $20,000 of capital; some witnesses say $40,000. Armistead stopped business in July, 1884, and made an assignment to W. D. Courtney as trustee, preferring the Talbotts for $10,846; preferring Robert Armistead for $2,500, with interest for two years and a half, and also for $300; and preferring A. W. Garber for $500; the total preferences being $14,521, on assets producing only $8,310.

The deed of assignment was executed on the ninth day of July, 1884, and conferred extraordinary powers and discretion upon Courtney, the trustee. He was empowered to convert the property conveyed into cash as speedily as he could do so with advantage to the trust fund; to sell with or without notice, as he might think best, and in such manner as to him might seem most judicious; to sell as a

whole, or in such portions as he might think proper from time to time, and either by private sale or at public auction, for cash or on credit, and altogether in such manner and upon such terms as he might deem advantageous to the fund. With a view to winding up the business, and selling the assets to the best advantage, he was empowered to continue the business for such time as he should think best; and, in doing so, to make such purchases as might be necessary to enable him *to continue and carry on the business with a view to winding it up.* He was authorized, in collecting debts due the house, to compromise them at his discretion; and to employ agents and counsel, and pay them at his discretion. While the deed does not require creditors to release their debts on receiving dividends, yet it confers upon them no power by any action of their own, either singly or collectively, to check or control the trustee in the exercise of the unlimited discretion conferred upon him, and to wind up and terminate the business in the manner usual with trustees.

There can be no doubt that Courtney, the former partner and confidential agent and manager for Armistead, knew that his principal was operating without capital; that he was holding out to his mercantile creditors from whom he was making purchases that he was operating on a large reserve of ready capital; and that these creditors were dealing with him on the faith of such capital, in ignorance of the fact that he was all the time insolvent, and that large family debts of many thousand dollars were lying in abeyance, to be preferred whenever the business should come to the disastrous end which was inevitable. The proofs show that the trustee was as fully cognizant of the facts which characterized the business of Armistead, and which affected the *bona fides* of his deed, as Armistead was himself.

On such a condition of facts as is shown by the testimony in this case, I do not feel that it is necessary for me to resort to the law reporters for authority to set aside this deed. It seems to me to be patent on the face of the deed that it was made with intent to hinder and delay Armistead's creditors in the collection of their debts; and, as to the mercantile creditors, I do not know how a more gross injustice could be done those who gave credit on the faith of a large in-put capital than was done by this deed, which revealed the fact, when it was too late, that there was no capital whatever available to protect them in the event of losses in trade and shrinkage of values.

I am clear that the deed should be set aside.

### NOTE.

For general discussion of the question of assignments for the benefit of creditors, preferences in, void assignments, and fraudulent assignments, see Wooldridge v. Irving, 23 Fed. Rep. 676, and note, 682–691.

An assignment for the benefit of creditors, authorizing the assignee "to carry on and conduct said business in his discretion, for such time as in his judgment it shall be beneficial to do so; or to sell all of said goods and stock in trade and property at such times, in such manner, and for such prices as he may deem proper, and apply the net proceeds;" etc.,—is void. Jones v. Syer, 52 Md. 211.

An assignment for the benefit of creditors, authorizing the assignee to "sell and dispose of the property, and generally convert the same into money, upon such terms and conditions as in his judgment may appear just and for the interest of all parties interested," was held not to be void upon its face, in Brahmstadt v. McWhirter, (Neb.) 2 N. W. Rep. 232.

It was said in Richardson v. Marqueze, 59 Miss. 80, that an assignment for the benefit of creditors is not invalidated by empowering the assignee in his discretion to sell for cash, or on such credit as he shall deem for the advantage of all the creditors.

In Perry Ins. & Trust Co. v. Foster, 58 Ala. 502, an assignment, for the benefit of creditors, of a plantation, together with the personal property used in cultivating crops upon it, was made in the spring; and provided that the sale should be delayed until the first of December following; and that meantime the property should remain in possession of the assignors, to be used in cultivating the crops; and that the crops, when gathered, should be delivered to the assignee, and distributed under the assignment. It appearing that such property could not be advantageously rented in the spring, and would be sacrificed by a sale then, or if stripped of the personal property, the provision in the assignment was held valid.